**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**



JOSE DECASTRO,

                Plaintiff,

v.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT,

CLARK COUNTY, NEVADA,

2:26-cv-00373-APG-MDC

SERGEANT HUTCHINSON, in his individual capacity,

OFFICER BRUEN, in his individual capacity,

OFFICER FRUMPKIN, in his individual capacity,

SUPERVISING OFFICER DANNY ROSE (Badge #983), in his individual capacity,

OFFICER "TOMMY" (last name unknown), in his individual capacity,

JOHN DOES 1–5, in their individual capacities,

                Defendants.

**COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

(42 U.S.C. § 1983 — First Amendment Retaliation, Fourth Amendment

Unlawful Seizure and Excessive Force, Fourteenth Amendment Fabrication/Suppression,

Failure to Intervene, Monell Liability; Supplemental State Law Claims)

## I. INTRODUCTION

1. This case presents a clear violation of the United States Constitution by law enforcement officers acting under color of state law. It concerns the targeted harassment, retaliatory seizure, custodial arrest, and use of force against a widely followed police accountability journalist for engaging in core First Amendment activity—publicly documenting police conduct from a public street.

2. On the night of February 14, 2024, Plaintiff Jose DeCastro, a constitutional law educator, journalist, and operator of the Delete Lawz YouTube channel, was walking along a public street near the site of a fatal traffic accident that had already been fully cleared. No damaged vehicles remained at the scene. No active investigation was underway. No emergency personnel were rendering aid. The road was open to the public. Plaintiff began filming the remaining police presence from the public roadway.

3. An LVMPD officer identified by fellow officers as "Tommy" affirmatively directed Plaintiff to "pass this brick wall" and "cut through the parking lot." Plaintiff complied. Moments later, other officers confronted Plaintiff in the very location to which he had been directed. Officers then issued contradictory orders, surrounded Plaintiff with at least four officers, and ultimately seized him by force—tackling and handcuffing him with two sets of handcuffs—despite Plaintiff's repeated invocation of his First and Fifth Amendment rights, his identification as a member of the press, and his attempts to walk away.

4. After the seizure, officers among themselves confirmed that "Tommy told him to walk through the parking lot." An officer expressly acknowledged on body-worn camera that Plaintiff was "okay to film." A supervising officer, Danny Rose (Badge #983), stated on body-worn camera: "He's a super well-known auditor... it's best to just leave him alone." That advice was disregarded. Plaintiff was booked into jail.

5. Plaintiff repeatedly asked officers to review his video footage showing that Officer "Tommy" had directed him into the area. Officers declined to review the exculpatory evidence before completing the arrest and booking.

6. Eleven months earlier, in March 2023, Plaintiff was unlawfully arrested by LVMPD Officer Brandon Bork while filming police activity. He was wrongly convicted and incarcerated for approximately four months. That conviction was subsequently overturned on appeal. Plaintiff filed a federal civil rights lawsuit and secured partial summary judgment, though the court granted qualified immunity to the arresting officer.

7. In the intervening months, Plaintiff's Delete Lawz YouTube channel regularly generated over 40 million views per month, with content frequently documenting LVMPD misconduct. The February 2024 arrest followed a period of intense public scrutiny of the department.

8. This lawsuit seeks redress for that retaliatory arrest, for the unlawful use of force, for the refusal to consider readily available exculpatory evidence, and for a broader, systemic failure by LVMPD and Clark County to implement policies preventing the repeated violation of core constitutional rights.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because all events giving rise to this action occurred in Clark County, Nevada, and all Defendants reside in or conduct official business within this District.

## III. PARTIES

12. Plaintiff Jose DeCastro is a resident of Los Angeles, California. He is a widely followed police accountability journalist, constitutional rights advocate, and operator of the Delete Lawz YouTube channel, which has approximately 669,000 subscribers and regularly reaches millions of viewers monthly through content focused on police accountability and constitutional education.

13. Defendant Las Vegas Metropolitan Police Department ("LVMPD") is a joint city-county law enforcement agency operating in Clark County, Nevada, under the authority of Clark County and the City of Las Vegas.

14. Defendant Clark County, Nevada, is a political subdivision of the State of Nevada. Clark County is responsible for the policies, practices, training, supervision, oversight, and discipline of LVMPD and its personnel. The Clark County Sheriff serves as the final policymaker for LVMPD with respect to law enforcement training, discipline, and use-of-force policies.

15. Defendant Sergeant Hutchinson is a sworn law enforcement officer employed by LVMPD who identified himself on Plaintiff's video recording as "Sergeant Hutch" and who identified himself as the commanding officer on scene. Sergeant Hutchinson issued the purported "lawful orders" that preceded and purportedly justified Plaintiff's seizure. He is sued in his individual capacity.

16. Defendants Officer Bruen and Officer Frumpkin are sworn law enforcement officers employed by LVMPD who were present at the scene and participated in the confrontation, surrounding, and physical seizure of Plaintiff. Each is sued in his individual capacity.

17. Defendant Supervising Officer Danny Rose (Badge #983) is a sworn law enforcement officer employed by LVMPD. Officer Rose identified himself by name and badge number on Plaintiff's video recording at timestamp 00:40 of the post-arrest footage. On body-worn camera, Officer Rose recognized that Plaintiff should be left alone and advised other officers to disengage. Despite this recognition, Officer Rose failed to exercise his supervisory authority to prevent Plaintiff's unlawful seizure and arrest. He is sued in his individual capacity.

18. Defendant Officer "Tommy" (last name unknown) is a sworn law enforcement officer employed by LVMPD who affirmatively directed Plaintiff to enter the area by telling him to "pass this brick wall" and "cut through the parking lot." This directive was captured on Plaintiff's video recording and was confirmed by a fellow officer on post-arrest footage, who stated: "Tommy told him to walk through the parking lot." Officer Tommy's full name and badge number will be confirmed through discovery. He is sued in his individual capacity.

19. Defendants John Does 1–5 are uniformed LVMPD officers who were present during the incident, participated in or witnessed the seizure of Plaintiff, and operated body-worn cameras. Their identities will be confirmed through discovery.

## IV. FACTUAL BACKGROUND

### A. The Cleared Accident Scene

20. On February 14, 2024, a fatal traffic accident had occurred in the area. By the time Plaintiff arrived at approximately 10:30 PM, the accident scene had been entirely cleared. No damaged vehicles remained. No active investigation was underway. No emergency personnel were rendering aid to any person. The roadway was open to the public.

21. Despite the absence of any ongoing emergency or active investigation, LVMPD officers maintained a presence in the area and continued to restrict access to portions of the public roadway. A civilian bystander, uninvolved in Plaintiff's arrest, stated on separate video footage: "You guys hijack the roads... this is a waste of taxpayer dollars."

22. When Plaintiff later asked officers what the crime scene concerned, an officer responded: "This is a fatal car accident." Plaintiff asked: "Am I anywhere near the fatal accident?" No officer identified any proximity of Plaintiff to any accident debris, evidence, or active investigation area. The purported "crime scene" had no remaining physical indicia of an active investigation at the location where Plaintiff was confronted.

23. Critically, any containment tape that may have been present was not visible from Plaintiff's point of entry. As Plaintiff stated on the post-arrest recording: "From over there, you can't see containment tape over here. I had no idea I was inside a contained area. When I crossed the road, I thought I was outside the tape." No officer warned Plaintiff that he was approaching or crossing any perimeter before confronting him.

24. At no point prior to the confrontation did any officer advise Plaintiff that he was approaching or entering a restricted area. No crime scene tape was visible from Plaintiff's approach path. Plaintiff crossed an open roadway used by civilians and observed multiple members of the public standing nearby. No signs, barriers, cones, or other physical indicators marked a restricted perimeter in the area where Plaintiff was walking. Plaintiff reasonably believed the area was

open to pedestrian traffic—a belief reinforced by the fact that an LVMPD officer affirmatively directed him to enter the area.

**B. Officer "Tommy" Directed Plaintiff Into the Area**

25. At approximately 00:33 on Plaintiff's video recording (Camera B), an LVMPD officer affirmatively directed Plaintiff: "Hey, once you pass this brick wall, just cut through the parking lot." Plaintiff complied with that direction and entered the parking lot area.

26. This officer was subsequently identified by fellow officers as "Tommy." On the post-arrest recording (Camera C), at timestamp 04:44, an officer stated to a colleague: "He was walking through the scene. Tommy told him to walk through the parking lot." Another officer added: "He was recording the bikes."

27. Plaintiff did not trespass into any restricted area. He was affirmatively directed into the area by an LVMPD officer. He was then confronted, surrounded, and arrested by other LVMPD officers for being in the very location to which their colleague had directed him. At no point prior to the confrontation did any officer inform Plaintiff that the area was restricted or that his presence was unlawful.

**C. The Initial Confrontation and Protected Speech**

28. At 01:14 on Plaintiff's Camera B video, an officer approached Plaintiff and said: "Hello, sir." Multiple officers then asked, in sequence: "Can we help you?"

29. Plaintiff identified himself as a member of the press, stated he was doing his job, and explicitly invoked his First Amendment right to film and his Fifth Amendment right against compelled self-incrimination. Plaintiff stated: "I'm a member of the press. I invoke my First Amendment right. I invoke my Fifth Amendment right. Don't ask me another question."

30. Plaintiff exercised his constitutionally protected right to verbally criticize the officers. The First Amendment protects the right of citizens to address police officers with criticism, including hostile or intemperate speech. *City of Houston v. Hill*, 482 U.S. 451, 461–62 (1987); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990). At no point did Plaintiff physically threaten any officer, physically resist, or obstruct any law enforcement operation.

## D. Contradictory Orders and Escalation

31. Officers issued a series of contradictory and inconsistent directives to Plaintiff:

    - At 00:33 (Camera B), Officer "Tommy" directed Plaintiff to "cut through the parking lot" — affirmatively directing him into the area.
    - At 01:55 (Camera B), a different officer stated: "You're still pretty close to the road. Let's push this out a little further. Just keep going that way."
    - At 03:05 (Camera B), an officer confirmed: "You're okay to film."
    - At 04:08 (Camera B), an officer said: "Keep walking."
    - At 04:12 (Camera B), Sergeant Hutchinson stated: "I gave you a lawful order. Keep walking."
    - At 05:23 (Camera B), Sergeant Hutchinson stated: "I'm giving you a lawful order. Let's start walking."

32. These directives were contradictory and escalating. Plaintiff was first directed into the area by Officer "Tommy," then told to move further away by another officer, then told he was "okay to film," then ordered to keep walking, then seized when he asserted his right to remain on a public street. No officer provided a consistent, lawful basis for requiring Plaintiff to leave a public area where the accident scene had already been fully cleared.

## E. Officers' Knowledge and Retaliatory Intent

33. Body-worn camera footage from the incident confirms that officers recognized Plaintiff. At timestamp 3:38 on BWC footage, one officer stated: "I've seen his videos on YouTube." Another responded: "So have I."

34. Supervising Officer Danny Rose explicitly advised others to disengage: "He's a super well-known auditor... it's best to just leave him alone." This direction was disregarded by the officers who ultimately seized Plaintiff.

35. On the post-arrest recording, an officer who had not witnessed the full encounter stated: "My understanding—and I haven't heard everything—is you can't film inside a crime scene." This statement reveals that the arresting officers communicated a false narrative to other officers: that

Plaintiff had been filming "inside a crime scene," when in fact (a) the scene had been cleared, (b) Plaintiff had been directed into the area by Officer "Tommy," and (c) an officer had confirmed Plaintiff was "okay to film."

36. Officers were aware that Plaintiff had previously been arrested by LVMPD in March 2023, that the conviction had been overturned, and that Plaintiff had filed a federal civil rights lawsuit against the department. Plaintiff stated on the post-arrest recording: "Pull up DeCastro versus LVMPD. This will be my third lawsuit." The decision to arrest Plaintiff—despite a supervisor's explicit warning, despite an officer's confirmation that filming was permitted, and despite Plaintiff's having been directed into the area by their own colleague—demonstrates that the arrest was motivated by retaliatory animus toward Plaintiff's public criticism of law enforcement.

**F. The Seizure and Use of Force**

37. Prior to the seizure, Plaintiff made no attempt to flee and was walking normally on a public street. Plaintiff posed no flight risk and no threat to officer safety or public safety.

38. By 05:36 on Camera B, Plaintiff stated: "Are you guys going to surround me? Leave me alone." At least four officers had encircled Plaintiff. An officer responded: "I'm escorting you."

39. Plaintiff stated: "I'm not trying to fight anyone. There's no victim. There's no crime. You're just trying to dominate another person."

40. At 06:19 (Camera B), Plaintiff stated: "Now you're threatening me with violence." At 06:24, Plaintiff stated: "Now they're pushing me. Look at their hands all over me."

41. Officers then tackled Plaintiff to the ground and placed him in two sets of handcuffs. Plaintiff had not physically resisted, had not threatened violence, had not attempted to flee, and had posed no threat to officer safety or public safety.

42. At 06:47 (Camera B), an officer stated: "You were given multiple warnings." This statement confirms the officers' own framing: Plaintiff was arrested not for any criminal conduct, but for failing to obey orders that lacked lawful basis.

**G. Absence of Probable Cause**

43. Defendants lacked probable cause or arguable probable cause to arrest Plaintiff for any offense, including obstruction, trespass, or failure to obey a lawful order, because: (a) Plaintiff was lawfully present on a public street and in a parking lot to which he had been affirmatively directed by Officer "Tommy"; (b) the accident scene had been fully cleared before Plaintiff arrived, and no active crime scene, investigation, or emergency existed at the location where Plaintiff was confronted; (c) any containment tape that may have existed was not visible from Plaintiff's approach path, and no officer warned him that he was entering a restricted area; (d) Plaintiff posed no safety risk to officers, emergency personnel, evidence, or the public; (e) an officer expressly confirmed Plaintiff was "okay to film"; and (f) Plaintiff's verbal criticism of officers, however intemperate, is constitutionally protected speech that cannot form the basis of probable cause. *City of Houston v. Hill*, 482 U.S. 451, 461–62 (1987).

44. The purported "lawful orders" issued by Sergeant Hutchinson cannot retroactively supply probable cause. An order to vacate a public space is not "lawful" where there is no active crime scene, no emergency, and no legitimate law enforcement interest in excluding the individual. Compliance with an unlawful order cannot be compelled, and failure to comply with an unlawful order does not constitute a criminal offense. The contradictory nature of the officers' directives—with Officer "Tommy" directing Plaintiff into the area and Sergeant Hutchinson ordering him out—further demonstrates the absence of any coherent legal basis for the arrest.

45. Defendants also lacked arguable probable cause. No reasonable officer could have believed that Plaintiff committed any offense where Plaintiff was lawfully present on a public street, had been affirmatively directed into the area by a fellow LVMPD officer, had been expressly told he was "okay to film," posed no threat to any person or to any law enforcement operation, was not within any marked or visible perimeter, and offered video proof of his compliance which officers refused to review. Under these circumstances, no objectively reasonable officer could conclude that probable cause existed for any arrest.

**H. Post-Arrest Conduct: Refusal to Review Exculpatory Evidence**

46. Following the seizure, Plaintiff was cooperative. He provided his identification, did not resist, and repeatedly assured officers he would not flee: "I'm not going to run. I'm a known journalist. I have a million subscribers. I'm not going to run."

47. Plaintiff repeatedly and explicitly asked officers to review his video footage showing that Officer "Tommy" had directed him into the area. At 07:15 on the post-arrest recording, Plaintiff stated directly to Officer Rose: "Mr. Rose, I want to say this out loud because my camera is running: There is video evidence that I was told to walk through that parking lot. If you don't look at it, that's going to be an issue because they're saying something else. It's on camera. I filmed him saying it."

48. At 13:53, Plaintiff reiterated: "You have the responsibility to look at my footage showing that the officer told me to cut through the parking lot. If you neglect it, that's on you."

49. Officers declined to review the readily available exculpatory evidence before completing the arrest. Instead, Plaintiff was booked into jail.

50. The refusal to review available exculpatory evidence—video footage on Plaintiff's own camera, which Plaintiff offered to show officers—before completing a custodial arrest demonstrates deliberate indifference to the lawfulness of the arrest and a reckless disregard for Plaintiff's constitutional rights.

**I. Plaintiff's Dog Left Unattended**

51. At the time of his arrest, Plaintiff had his dog with him. Plaintiff asked officers: "What about my dog? Can I call my nephew to get my dog?" Upon information and belief, Plaintiff's dog was left unattended as a result of the arrest, causing Plaintiff additional distress and creating a risk of harm to the animal.

**J. Prior Wrongful Arrest and Pattern of Retaliation**

52. In March 2023, Plaintiff was arrested by LVMPD Officer Brandon Bork while filming police activity. Plaintiff was convicted and incarcerated for approximately four months. That conviction was subsequently overturned on appeal.

53. Plaintiff filed a federal civil rights lawsuit arising from the 2023 arrest. The court granted partial summary judgment in Plaintiff's favor, finding genuine disputes of material fact as to the constitutionality of the arrest. However, the court granted qualified immunity to Officer Bork.

54. Following the 2023 incident, LVMPD took no corrective action. No officers were disciplined. No retraining was conducted regarding the First Amendment rights of journalists and members of the public to film police activity. No policy changes were implemented to prevent recurrence. This deliberate inaction directly enabled the February 2024 incident.

55. Additional body-worn camera footage from the night of February 14, 2024, shows officers shouting at uninvolved civilians, blocking roadways without justification, and exercising authority after the emergency had fully resolved—consistent with a broader pattern of overreach.

## V. CLAIMS FOR RELIEF

### COUNT I

### First Amendment Retaliation (42 U.S.C. § 1983)

(Against All Individual Defendants)

56. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

57. Plaintiff engaged in constitutionally protected activity: filming public officials performing their duties in a public place, verbally criticizing law enforcement officers, and distributing recordings of police conduct to the public through his YouTube channel.

58. The Ninth Circuit has long recognized the right to record police activity in public. *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First Amendment right to film matters of public interest"); *Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013) (holding that the right to photograph a traffic accident scene during a police investigation was "clearly established"); *Askins v. U.S. Dep't of Homeland Security*, 899 F.3d 1035, 1044 (9th Cir. 2018) (the First Amendment protects "the right to record law enforcement officers engaged in the exercise of their official duties in public places"). Every federal circuit to address this issue has reached the same conclusion. *Glik v. Cunniffe*, 655 F.3d 78, 82–83 (1st Cir. 2011); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–89 (5th Cir. 2017). The right was clearly established at the time of the incident and no reasonable officer could have believed otherwise.

59. Defendants' actions—including surrounding, seizing, tackling, handcuffing, and booking Plaintiff into jail—constituted adverse action that would chill a person of ordinary firmness from continuing to engage in protected activity.

60. Defendants' retaliatory intent is demonstrated by: (a) their recognition of Plaintiff from his YouTube channel, as captured on body-worn camera; (b) their disregard of Supervising Officer Rose's explicit instruction to disengage; (c) an officer's own admission that Plaintiff was "okay to film"; (d) the complete absence of any legitimate law enforcement justification, given that the accident scene had been fully cleared and Plaintiff had been directed into the area by Officer "Tommy"; (e) the refusal to review readily available exculpatory video evidence before completing the arrest; and (f) the pattern of prior retaliation against Plaintiff by the same department, including the 2023 wrongful arrest.

61. A causal connection exists between Plaintiff's protected activity and the adverse action. But for Plaintiff's exercise of his First Amendment rights—filming and criticizing officers—the arrest would not have occurred.

62. Plaintiff was seized within minutes of invoking his First Amendment rights and criticizing officers. This temporal proximity between protected speech and adverse government action is strong evidence of retaliatory motive.

63. Under *Nieves v. Bartlett*, 587 U.S. 391 (2019), a plaintiff pressing a retaliatory arrest claim must generally plead and prove the absence of probable cause. Plaintiff satisfies this requirement. As set forth in Section IV.G above, Defendants lacked probable cause or arguable probable cause to arrest Plaintiff for any offense. The temporal proximity between Plaintiff's protected speech and the seizure, combined with officers' recognition of Plaintiff from his YouTube channel, their disregard of Supervising Officer Rose's express instruction to disengage, their refusal to review readily available exculpatory video evidence, and the complete absence of any criminal conduct by Plaintiff, establishes that Plaintiff's arrest was substantially motivated by retaliatory animus toward his protected First Amendment activity.

64. Even were this Court to find arguable probable cause, the *Nieves* exception applies. Plaintiff can demonstrate by objective evidence that similarly situated individuals who were not engaged in protected speech were not arrested: other civilians were present in the same area on the same

evening, including the bystander who stated on camera that officers were "hijack[ing] the roads," and none of those individuals were detained, seized, or arrested. Plaintiff was singled out because of his identity as a known police accountability journalist and because of the content of his speech.

65. Defendants are not entitled to qualified immunity. The right to film police officers in public places and to verbally criticize them without being subjected to arrest or force was clearly established at the time of the incident in the Ninth Circuit and nationwide. *Askins*, 899 F.3d at 1044; *Adkins*, 537 F. App'x at 722; *City of Houston v. Hill*, 482 U.S. 451 (1987); *Glik*, 655 F.3d at 84.

## COUNT II

### Fourth Amendment: Unlawful Seizure and Excessive Force (42 U.S.C. § 1983)

(Against All Individual Defendants)

66. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

67. Plaintiff was seized and subjected to a full custodial arrest—including being tackled, handcuffed with two sets of handcuffs, and booked into jail—without probable cause or reasonable suspicion of criminal activity, in violation of the Fourth Amendment. As set forth in detail in Section IV.G above, Defendants lacked probable cause or arguable probable cause for any offense.

68. No crime had been committed. No obstruction occurred. The accident scene had been fully cleared before Plaintiff arrived. Plaintiff had been affirmatively directed into the area by Officer "Tommy." An officer confirmed Plaintiff was "okay to film." Plaintiff's presence on a public street and his exercise of First Amendment rights did not constitute criminal conduct. The Ninth Circuit has specifically held that the right to photograph an accident scene during a police investigation is clearly established. *Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013).

69. The purported "lawful orders" issued by Sergeant Hutchinson lacked legal basis. Officers cannot lawfully order a person to vacate a public space where no active crime scene exists, no emergency is underway, and the person's presence poses no threat to any legitimate law

enforcement interest. The contradictory nature of the orders—with Officer "Tommy" directing Plaintiff into the area and Sergeant Hutchinson ordering him to leave—further undermines any claim that the orders were lawful.

70. The force used—surrounding Plaintiff with four officers, tackling him to the ground, and restraining him in two sets of handcuffs—was objectively unreasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

71. In evaluating the reasonableness of force under *Graham*, the relevant factors weigh decisively in Plaintiff's favor: (a) Plaintiff was not suspected of committing any crime; (b) Plaintiff posed no immediate threat to the safety of officers or others—he was walking on a public street and verbally criticizing officers; and (c) Plaintiff was not actively resisting arrest or attempting to evade officers—he explicitly stated on camera: "I'm not trying to fight anyone," and after arrest he repeatedly assured officers: "I'm not going to run."

72. The refusal to review Plaintiff's video evidence—which would have immediately confirmed that Officer "Tommy" directed Plaintiff into the area—before completing the custodial arrest and booking further demonstrates that the arrest was conducted without regard to probable cause.

## COUNT III

**Fourteenth Amendment: Substantive Due Process — Fabrication of False Narrative and Suppression of Exculpatory Evidence (42 U.S.C. § 1983)**

(Against All Individual Defendants)

73. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

74. Separate and apart from the Fourth Amendment violations set forth in Count II, Defendants violated the Fourteenth Amendment's guarantee of substantive due process by fabricating a false justification for Plaintiff's arrest and deliberately suppressing readily available exculpatory evidence. This conduct shocks the conscience and is not governed by the Fourth Amendment's reasonableness standard because it involves post-hoc fabrication and evidence suppression rather than the seizure itself.

75. Specifically, Defendants' conduct that shocks the conscience includes:

- Officers communicated a false narrative to colleagues—that Plaintiff had been filming "inside a crime scene"—when in fact Plaintiff had been directed into the area by their own colleague, Officer "Tommy," and the accident scene had been fully cleared;

- Officers refused to review readily available exculpatory video evidence—footage on Plaintiff's own camera, which Plaintiff repeatedly offered to show them—that would have immediately confirmed Plaintiff had been directed into the area by a fellow officer;

- Officers proceeded with a full custodial arrest and booking despite actual knowledge, from Supervising Officer Rose's statements and from their own colleague's admission, that the arrest lacked justification;

- This fabrication and suppression was not a mistake or oversight. Officers had direct access to the truth—from Officer "Tommy" who directed Plaintiff in, from the officer who confirmed Plaintiff was "okay to film," from Supervising Officer Rose who recognized the encounter was unjustified, and from Plaintiff's own video footage—and chose to disregard all of it.

76. This conduct is not merely negligent or reckless. It represents a deliberate decision to fabricate a basis for arrest, suppress evidence that would have prevented it, and use the power of the state to punish constitutionally protected activity—in defiance of a supervisor's instruction and with full knowledge of the illegality of the officers' actions.

## COUNT IV

### Failure to Intervene (42 U.S.C. § 1983)

(Against Supervising Officer Danny Rose and John Does 1–5)

77. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

78. Officers present at the scene who did not directly participate in the physical seizure of Plaintiff had a reasonable opportunity to intervene and prevent the constitutional violations described herein. They failed to do so.

79. Supervising Officer Danny Rose (Badge #983) recognized that Plaintiff should be left alone and affirmatively advised other officers to disengage: "He's a super well-known auditor... it's best to just leave him alone." Despite this recognition—demonstrating actual knowledge that the encounter was unjustified—Officer Rose failed to exercise his supervisory authority to prevent the unlawful seizure, use of force, and custodial arrest of Plaintiff.

80. After the arrest, Officer Rose was present and interacted directly with Plaintiff, who identified Rose by name and badge number on camera. Rose was aware that Plaintiff was claiming he had been directed into the area by Officer "Tommy." Rose was aware that Plaintiff was requesting review of exculpatory video evidence. Rose had the authority and opportunity to halt the arrest and review the evidence. He failed to do so.

81. An officer's failure to intervene to prevent a constitutional violation by a fellow officer, where the officer had reason to know of the violation and a realistic opportunity to intervene, gives rise to independent liability under § 1983. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

## COUNT V

### Monell Liability (42 U.S.C. § 1983)

(Against LVMPD and Clark County)

82. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

83. The constitutional violations described herein were not the result of isolated misconduct but were caused by official policies, customs, and practices of LVMPD and Clark County, as well as the deliberate indifference of final policymakers to the known risk of constitutional violations against journalists and First Amendment auditors. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978).

84. Specifically, LVMPD and Clark County maintain policies, customs, or practices that:

- Retaliate against known public critics of law enforcement, including auditors and citizen journalists, through pretextual arrest and use of force;

- Fabricate or expand crime scene perimeters without legal justification to exclude individuals engaged in protected newsgathering activity;

- Issue contradictory orders to individuals exercising First Amendment rights and then arrest those individuals for failure to comply;

- Fail to review readily available exculpatory evidence before completing custodial arrests;

- Communicate false or misleading justifications for arrests among officers to create a post hoc narrative of probable cause;

- Fail to adequately train officers on the clearly established First Amendment right of the public and press to film police activity;

- Fail to train officers on the legal limitations of crime scene authority where no active emergency or investigation exists;

- Tolerate and fail to discipline officers who engage in retaliatory or unconstitutional conduct against members of the press and public.

85. The failure to impose any corrective action following Plaintiff's 2023 wrongful arrest—including no officer discipline, no retraining on First Amendment rights, and no policy reform—demonstrates deliberate indifference by LVMPD and Clark County to the known and obvious risk that officers would continue to violate the constitutional rights of journalists and auditors. The February 2024 incident was a direct and foreseeable consequence of that failure.

86. The Clark County Sheriff, as final policymaker for LVMPD, had actual or constructive knowledge of the 2023 wrongful arrest, the overturned conviction, and the pending federal civil rights litigation, and failed to take any corrective action to prevent recurrence.

87. Upon information and belief, LVMPD has repeatedly detained or arrested auditors and journalists engaging in protected recording activity without probable cause. The February 2024 arrest of Plaintiff was not an isolated incident but part of a pattern and practice of retaliatory enforcement against individuals who publicly document and criticize police conduct.

## COUNT VI

**State Law Claims: Assault and Battery**

(Against All Individual Defendants)

88. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

89. Defendants' conduct in surrounding, tackling, and forcibly handcuffing Plaintiff without lawful justification constitutes assault and battery under Nevada common law.

90. Defendants acted in bad faith and outside the scope of their lawful authority. Their conduct is not protected by discretionary function immunity under NRS 41.032.

91. This Court has supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367.

## COUNT VII

### State Law Claim: False Arrest and False Imprisonment

(Against All Individual Defendants)

92. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

93. Defendants caused Plaintiff to be arrested and booked into jail without probable cause or legal justification, constituting false arrest and false imprisonment under Nevada common law.

94. Plaintiff was confined against his will, handcuffed with two sets of handcuffs, transported, and booked into jail. The restraint was not privileged because no probable cause existed for the arrest. Plaintiff had been directed into the area by an LVMPD officer, was engaged in lawful First Amendment activity, and committed no criminal offense.

95. This Court has supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    a. Award compensatory damages in an amount to be determined at trial, including but not limited to damages for emotional distress, humiliation, loss of liberty, chilling of First

Amendment activity, economic losses resulting from Defendants' conduct, and distress caused by the forced separation from Plaintiff's dog;

b. Award punitive damages against each individual Defendant in an amount sufficient to deter future unconstitutional conduct;

c. Enter a declaratory judgment that Defendants' conduct violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution;

d. Enter injunctive relief requiring LVMPD and Clark County to implement mandatory training on the First Amendment rights of journalists and members of the public to film police activity, on crime scene perimeter limitations, on the obligation to review readily available exculpatory evidence before completing custodial arrests, and on de-escalation;

e. Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

f. Grant such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues so triable.
Respectfully submitted,

_____
Jose DeCastro
5350 Wilshire Blvd
PO Box 36143
Los Angeles, CA 90036
chille@situationcreator.com
Plaintiff, Pro Se

## VERIFICATION

I, Jose DeCastro, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 2-13-26

_____
Jose DeCastro